**H. K. H. CO., a partnership, consisting of Henry S. Hendler and J. M. Hendler, Plaintiff-Appellant,**

v.

**AMERICAN MORTGAGE INSURANCE COMPANY, Defendant-Appellee.**

No. 80–4289.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 15, 1981.

Decided Aug. 24, 1982.

Rehearing Denied Nov. 18, 1982.

Jerome H. Sarrow, Kranitz, Comparet & Sarrow, Los Angeles, Cal., for plaintiff-appellant.

Arch T. Allen, III, Allen, Steed & Allen, Raleigh, N. C., M. Craig Haase, Reno, Nev., for defendant-appellee.

Before SCHROEDER and POOLE, Circuit Judges, and KELLEHER,* District Judge.

KELLEHER, District Judge:

The appellant, H.K.H. Co., appeals from the district court's order, after trial without a jury, that judgment be entered in favor of the appellee, American Mortgage Insurance Company. The question presented to this court is whether the appellee breached its contract to provide lease guarantee insurance by refusing to fulfill the terms and conditions of the guaranteed lease after becoming the defaulting lessee's successor in possession.

The appellee, a Nevada partnership, filed this action on May 15, 1978, in the Second Judicial District Court of Washoe County, Nevada. The appellant, a North Carolina corporation, thereafter removed to the United States District Court for the District of Nevada, pursuant to 28 U.S.C. § 1441(a). On May 2, 1980, the district court entered its memorandum decision and order granting judgment in favor of appellee and denying the award of attorney's fees. 490 F.Supp. 1201 (D.Nev.1980). As discussed below, we affirm the district court's order.

I.

In 1973, D.H. Overmeyer Co., Inc. ("Overmeyer") sold its warehouse in Sparks, Nevada to Bergin Way Associates ("Bergin Way") and then leased back the property on a "net-net-net" basis for twenty-five years. "Net-net-net" leases are commonly used for commercial properties. Under a net-net-

net lease, the lessee pays rent and all costs and expenses arising from the property, including taxes and insurance. The agreed-upon rent was approximately $12,-400/month. As a condition to the sale and lease-back arrangement, Bergin Way required Overmeyer to obtain lease guarantee insurance. The appellee, American Mortgage Insurance Company ("AMIC"), provided this insurance after it had seen a copy of the Overmeyer lease and upon Overmeyer's payment of a single premium of $56,739. Under the lease guarantee insurance policy ("the policy"), AMIC guaranteed that Bergin Way would receive a monthly rental payment of $11,617.40 per month for the first eleven years of the Overmeyer lease.

The parties' dispute concerns paragraph 11(b) of the policy, entitled "Minimization of Rental Losses." That paragraph provides:

> Company's Rights—At any time after the lessor notifies /AMIC/ by means of a notice of default or a default status report ..., that the lessee is thirty (30) days in default on a rental installment, then the Company may direct the lessor to commence appropriate action, including legal proceedings, if necessary, to obtain physical possession of the demised premises and to make all reasonable efforts to rerent said premises. The lessor shall agree to accept the company as a *successor in possession* to the lessee in default with the right to sublet or relet the premises to a tenant of /AMIC's/ own choosing for the unexpired term of the lease. No such sublessee or subtenant, however, shall use the premises for any purpose prohibited in the original lease. (emphasis added)

Thus, AMIC had two options under paragraph 11(b) upon the lessee's default. It could either allow the lessor to attempt to relet the premises, or it could take possession and use its own efforts to obtain new tenants. The policy also contained a nine-

* Honorable Robert J. Kelleher, United States District Judge, Central District of California, sitting by designation.

ty-day deductible, which provided that AMIC would not make any rental payments to the lessor for the first three months of the lessee's default.

Shortly after execution of the lease, Overmeyer defaulted in its monthly rental payments, filed for bankruptcy, and surrendered possession of the warehouse. AMIC chose to take possession, thereby becoming Overmeyer's "successor in possession," and also began making monthly rental payments to Bergin Way of $11,617.40. At the same time AMIC collected rent from various tenants who had subleased from Overmeyer. In early 1976 those subleases began to expire, and the warehouse virtually emptied. Three steps were taken to gain new occupants. First, AMIC hired a broker, who leased the premises on the basis of gross leases.[1] The district court found the rentals negotiated by the broker to be "on the low side of the then prevailing market rate, but not unreasonably so" in light of the circumstances. Second, AMIC spent $112,000, and Bergin Way spent $15,000, on improvements and repairs. Third, Bergin Way spent $73,000 on a new roof. A portion of that sum was loaned to Bergin Way by AMIC.

In 1978, Bergin Way sold the property to the appellant, H.K.H. Co. ("H.K.H."). AMIC agreed to accept H.K.H. as Bergin Way's successor under the insurance policy. AMIC has paid H.K.H. $11,617.40 per month since the sale, but has refused to pay H.K.H. the taxes and other expenses that Overmeyer would have paid to Bergin Way or H.K.H. under the Overmeyer lease. Shortly after sale of the warehouse to the appellant, H.K.H. filed its complaint against AMIC for breach of contract and breach of an insurer's duty to deal fairly and in good faith. H.K.H. contends that when AMIC became Overmeyer's "successor in possession," it became liable to the lessor for the taxes and other expenses that would have been paid under the Overmeyer lease. The question presented to the court below,

and to this court, is narrow: Under the language of the policy, did AMIC become obligated to fulfill the terms and conditions of the net-net-net Overmeyer lease, including payment of expenses and taxes, when it became Overmeyer's "successor in possession"?

## II.

Where a civil action is brought under diversity jurisdiction, this court defers to the district court's interpretation of the law of the state in which the district court sits, unless that interpretation is clearly wrong. *E.g., Pankow Construction Co. v. Advance Mortgage Corp.*, 618 F.2d 611 (9th Cir. 1980). However, appellant does not contend that the district court incorrectly determined the relevant Nevada law. Instead, appellant contends that the lower court incorrectly applied state principles of contract interpretation. A district court's interpretation of a contract, including a finding that the contract is or is not ambiguous, is freely reviewable. *E.g., Boudreau v. Borg-Warner Acceptance Corp.*, 616 F.2d 1077 (9th Cir. 1980).

In construing the language of an insurance contract, as in construing the language of any contract or written instrument, the intention of the parties should control. *Home Indemnity Co. v. Desert Palace, Inc.*, 86 Nev. 234, 236, 468 P.2d 19, 21 (1970). "A court should ascertain the intention of the parties from the language employed as applied to the subject matter in view of the surrounding circumstances," *Mohr Park Manor, Inc. v. Mohr*, 83 Nev. 107, 112, 424 P.2d 101, 105 (1967). In construing insurance contracts, the Nevada courts have further stated that the terms of a clause should be taken and understood "in their plain, ordinary, and popular sense." *Home Indemnity Co. v. Desert Palace, Inc.*, 86 Nev. at 236, 468 P.2d at 21. However, the latter statement is not helpful where, as here, the dispute concerns interpretation of a clause, "successor in possession," that has

---

**1.** Gross leases are leases under which tenants have no responsibility for the payment of expenses and taxes.

no ordinary, popular sense. Moreover, there appear to be no cases that either have construed the contractual term, "successor in possession," or have delineated the general duties of the insurer, under a lease guarantee policy, upon the tenant's default.[2]

■ A close examination of the policy compels the conclusion that the parties intended AMIC's liability, as a successor in possession, to be no more than the guaranteed rental payment of $11,617.40 per month. This examination begins with analysis of the parties' use of the phrase "successor in possession." The word "successor" has been defined as "one who takes the place that another has left, and sustains the like part or character. The definition goes beyond the borders of contract assignment and is used so as to obviate the need for an express assumption of burdens." *Safer v. Perper,* 569 F.2d 87, 95 (D.C.Cir.1977) (citations omitted). Using this definition, the appellant argues that, by electing to become Overmeyer's "successor," AMIC assumed the benefits *and the burdens* of the Overmeyer lease. However, the parties modified the word "successor" by the words "in possession." The inference to be drawn from this modification is that the parties intended "successor" to be limited in meaning: AMIC was to take the place of the defaulting lessor only insofar as AMIC would take possession of the warehouse.

This construction of "successor in possession" is buttressed by the parties' inclusion of the last sentence in paragraph 11(b): "[N]o such sublessee or subtenant, however, shall use the premises for any purpose prohibited in the original lease." We concur with the finding of the district court that this sentence would be surplusage if AMIC, as successor in possession, became bound by all lease covenants. Contracts should not be construed in a manner that renders the

document, or portions thereof, meaningless. *E.g., Gray v. Travelers Indemnity Co.,* 280 F.2d 549, 552 (9th Cir. 1960).

Finally, when viewed as a whole, the policy seems to contemplate a spreading, and not a complete shifting, of risk and loss. First, rental payments are only guaranteed for eleven of the twenty-five years of the lease. Second, under the deductible clause, the lessor cannot recover rent for the first three months of default. Third, the policy's guaranteed rental payment is approximately eight hundred dollars less per month than the rent payments owed by the lessor. The overall purpose of the policy is, as the district court found, "to insure payment of a substantial portion of the monthly rent due under the Overmeyer lease in event of default thereunder."

The appellant argues that when the insurer decided to take possession, it effectively assumed all of the risk of loss, *i.e.* all of the risk that new, obtainable, subtenants would not pay what the defaulting lessee paid for expenses, taxes, insurance and rent. Under this argument, the "benefit of taking possession" entails the "burden" of assuming the risk that new subtenants will not pay what the old one paid. This benefit/burden analysis does not stand up to close scrutiny. If the market rental price for the leasehold (under a net-net-net lease) approximately equals the rent paid by the defaulting lessor at the time of default, the insurance company will probably choose not to take possession of the premises, but instead let the lessor make "reasonable efforts" to rerent them, as allowed by paragraph 11(b). But when the market price has dipped significantly below the lease price, the insurer is less likely to accept the lessor's interpretation of "reasonable efforts" to rerent. In that situation, the lessor will probably prefer to assume the responsibility of reletting, rather than squab-

**2.** Lease guarantee insurance was first offered in the United States in 1965, by the Small Business Administration. *See generally* Ford, *Another View of the SBA "Lease" Guarantee Program,* 25 Bus.Law. 1053 (1970); Grillo, *The Small Business Administration "Lease" Guarantee Program,* 24 Bus.Law. 1193 (1969). Gradually, private insurance companies such as AMIC came to offer the same type of insur-

ance. Because lease guarantee insurance has been in existence for a relatively short period of time, few cases have dealt with issues raised with respect to this type of insurance. *See Valley View Shopping Center, Ltd. v. United States,* 535 F.2d 42 (Ct.Cl.1976); *Sunshine v. M. R. Mansfield Realty, Inc.,* 195 Colo. 95, 575 P.2d 847 (1978).

bling with the lessor over what constitutes a "reasonable" effort in a depressed market. In becoming Overmeyer's "successor in possession," AMIC assumed the cost of finding new tenants, thus saving Bergin Way an expense it otherwise would have borne. The purpose and effect of paragraph 11(b) is to allow the insurer to mitigate its own damages, by allowing it to hire and pay for its own broker, if it does not trust the lessor's reasonable efforts to relet.

The appellant makes much of the argument that, under the above interpretation of the policy, the insurer can unfairly profit by the lessee's default. This unfair profit would accrue to the insurer where the insurer is able to collect rents far exceeding $11,617.40 per month, but, as does AMIC, refuses to tender more than the guaranteed rental payment and further refuses to pay taxes and other expenses. However, the potential for unfair profit is minimal. It is unlikely that a lessee will default when the rental market price for the property equals or exceeds the rent and net expenses the lessee is obligated to pay. The lessee will default only where he has overestimated the amount of rent that he will be able to collect from subtenants and where his rent payments therefore come to exceed the property's market rental value. In that situation the insurer will not make any profit by taking possession. In the unusual situation where the market value equals or exceeds the tenant's financial obligations under the lease, and the tenant nevertheless defaults, the lessor may preempt the insurer from taking possession by simply terminating the lease and seeking new tenants himself. The lessor is by no means forced to take the insurer as a new lessee.

### III.

Under Nevada law, ambiguity in an insurance contract is construed against the insurer. *Catania v. State Farm Life Ins. Co.*, 95 Nev. 532, 534, 598 P.2d 631, 633 (1979); *Gerhauser v. North British and Mercantile Ins. Co.*, 7 Nev. 174, 186 (1871). Although this rule seems designed primarily for the protection of the individual consumer, it is applied even when the insured is a commercial party. *See Harvey's Wagon*

*Wheel v. MacSween*, 96 Nev. 215, 220, 606 P.2d 1095, 1098 (1980). Nevada courts similarly construe an ambiguity in a contract drafted by a compensated surety against the surety. *Acoustics, Inc. v. American Surety Co.*, 74 Nev. 6, 10, 320 P.2d 626, 628 (1958). In contrast to the rules applied to insurers and compensated sureties, "a guarantor's liability is strictly construed and ... will not be extended beyond the precise provisions of his guaranty." *Adelson v. Wilson & Co.*, 81 Nev. 15, 21, 398 P.2d 106, 109 (1965). AMIC appears to be both an insurer and a guarantor, but because it is a compensated guarantor, Nevada would probably apply the same rule of strict construction against the appellee as it applies against compensated sureties.

In view of the language and purpose of the entire lease guarantee insurance policy, paragraph 11(b) is not, however, ambiguous. After becoming Overmeyer's successor in possession, the appellee did not breach its lease guarantee insurance policy by refusing to pay the expenses and taxes that Overmeyer would have paid under its net-net-net lease. It necessarily follows that the appellee did not breach its duty to deal fairly and in good faith with the appellant. Accordingly, the judgment of the district court is AFFIRMED.