**FIRST BANK NATIONAL ASSOCIATION,**
**Trustee**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Receiver for Meritor Savings Bank.**

**Civ. A. No. 94–2197.**

United States District Court,
E.D. Pennsylvania.

April 20, 1995.

Brian P. Flaherty, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, for plaintiff.

Veronica Winter–Saltz, Miles H. Shore, Saul, Ewing, Remick & Saul, Philadelphia, PA, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARTLE, District Judge.

Plaintiff, First Bank National Association, Trustee ("First Bank"), brought this action for breach of contract against the defendant, the Federal Deposit Insurance Corporation ("FDIC"), pursuant to the Federal Deposit Insurance Act, 12 U.S.C. § 1811 et seq., as amended by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). First Bank alleges that the FDIC, as receiver for Meritor Savings Bank ("Meritor"), is liable for sums due un-

der a sublease of the landmark PSFS building Meritor once occupied at 12 South 12th Street, Philadelphia, Pennsylvania (the "PSFS building"). Jurisdiction arises pursuant to 12 U.S.C. §§ 1819(b)(2)(A) and 1821(d)(6).

The case was tried before the court without a jury on April 5 and 6, 1995. The following constitutes this court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

Meritor, the owner of the PSFS building, entered into a complex series of lease and sublease agreements with First Bank and various other entities[1] during the 1980's. Meritor apparently made these agreements as part of an arrangement to obtain loans. As a result of this series of agreements, First Bank became Meritor's landlord with respect to the PSFS building. The sublease was to run until December 31, 2006, with options to renew the sublease until December 31, 2036.

■ The Secretary of Banking of the Commonwealth of Pennsylvania declared Meritor to be in an unsafe and unsound condition on December 11, 1992. On the same day, the FDIC was appointed Meritor's receiver. On March 31, 1993, the FDIC disaffirmed Meritor's sublease of the PSFS building pursuant to 12 U.S.C. § 1821(e)(1). From the date of the FDIC's appointment as receiver until the date of the disaffirmance, the FDIC was bound by the terms of the sublease. § 1821(e)(4).

Paragraph 4(a) of the sublease between First Bank and Meritor required Meritor to "pay to [First Bank] in lawful money of the United States as fixed rent for the Premises" the amount of $1,806,000 per quarter. Paragraph 6(a)(i) committed Meritor to pay "all taxes, assessments, governmental or quasi-governmental levies, fees, water and sewer rents and charges, and all other governmental charges" imposed during the term of the sublease. Pursuant to Paragraph 6(b) of the sublease, Meritor was also obligated to

comply with and cause the Premises to comply with (i) all laws, ordinances and regulations, and other governmental rules, orders and determinations now or hereafter enacted, made or issued, whether or not presently contemplated....

Paragraph 9(a) of the sublease required Meritor, at its own expense, to

maintain all parts of the Premises in good repair and condition except for ordinary wear and tear and ... [to] take all action and ... make all structural and non-structural, foreseen and unforeseen and ordinary and extraordinary changes and repairs which may be required to keep all parts of the Premises in good repair and condition....

Pursuant to § 1821(e)(4)(B), First Bank, as lessor, is "entitled to contractual rent" from the FDIC "accruing before ... the disaffirmance [of the lease] ... becomes effective." In this case, as noted above, the FDIC disaffirmed the lease as of March 31, 1993.[2] First Bank claims that the FDIC is liable under § 1821(e)(4)(B) for

(1) $1,404,666.67 in unpaid "fixed quarterly rent" for the period October 1, 1992 through December 11, 1992;

(2) $224,119.68 in property taxes for the period January 1, 1993 through March 31, 1993;

(3) $285,000 for modification of the building to comply with the Americans with Disabilities Act ("ADA");

(4) $980,000 for rehabilitation of the north facade of the PSFS building;

(5) $50,000 for repair of the plumbing;

(6) $12,000 for repair of the electrical systems;

---

1. One of these other entities was Aljaf Associates Limited Partnership ("Aljaf"). The FDIC joined Aljaf as an involuntary plaintiff in this action after Aljaf sued it in the District Court for the District of Columbia seeking essentially the same damages claimed by First Bank. Aljaf, however, had assigned its rights in the sublease to First Bank on November 1, 1987. After this court granted the FDIC's motion to dismiss a fraud claim asserted by Aljaf, the FDIC dismissed Aljaf as an involuntary plaintiff.

2. Section 1821(e)(4)(B)(ii) bars First Bank from recovering "damages under any acceleration clause or other penalty provision in the lease."

(7) $355,000 for renovation and repair of the heating, ventilating and air conditioning ("HVAC") system;[3] and

(8) prejudgment interest on all of the above amounts.

The FDIC concedes liability for the amounts First Bank claims for Meritor's unpaid "fixed quarterly rent" and for taxes, but contests the other items.

■ The court, of course, must interpret the term "contractual rent" under § 1821(e)(4)(B) of FIRREA as a matter of federal statutory law, not as the parties may define it by contract. They may not limit or expand the recovery of "contractual rent" simply by the word formulation they employ. Otherwise, the intent of the federal law could be undermined. Consequently, we must look behind the words of the lease to the purpose for which the lessee is to pay consideration. We must then determine whether the obligation falls under the statutory rubric of "contractual rent."

While FIRREA does not define "contractual rent," the term "rent" has traditionally meant consideration paid by the lessee for the use and occupancy of the leased property. See Black's Law Dictionary 1297 (6th ed. 1990). The lease sometimes commits the lessee, in return for the use and occupancy of the property, to the payment of periodic lump sums with the lessor paying for other items such as property taxes and maintenance costs. See, e.g., H.K.H. Co. v. American Mortg. Ins. Co., 685 F.2d 315, 317 n. 1 (9th Cir.1982). On the other hand, sometimes the lessee's obligation to the lessor is broken down into periodic payments plus a separate commitment to pay such particulars as taxes and maintenance. See, e.g., H.K.H. Co., 685 F.2d at 316; Woods v. Callahan, 172 F.2d 179, 182 (1st Cir.1948). Any number of other variations may and commonly do occur. Whether in periodic lump sums or divided into several components, the payments to or on behalf of the lessor are all made in consideration of the use and occupancy of the leased property. We have found nothing to suggest that Congress intended the FDIC's liability for "contractual rent" to depend on which type of arrangement existed between the contracting parties so long as the lessee had a contractual obligation to pay. Under FIRREA, we conclude that "contractual rent" includes a lessee's responsibility under a lease for taxes and maintenance. See Pioneer Bank & Trust Co. v. Resolution Trust Corp., 793 F.Supp. 828, 830 n. 8 (N.D.Ill. 1992).

Nonetheless, we do not believe that Congress meant to include in the term "contractual rent" any contractual obligation on the part of a lessee to make capital expenditures or improvements. They are different in kind from ordinary repairs or maintenance. Capital expenditures have been defined as "[a]ny amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." I.R.C. § 263. Such improvements by their nature generally have a value to the lessor far beyond the value to the lessee. We have discovered no case or other authority in which such outlays have ever been considered to be "rent." Nor has anything been called to our attention that suggests it is customary or usual for lessees to make separate payments for capital improvements under a lease. Without any contrary indication from Congress, we conclude that capital outlays are not part of "contractual rent."[4]

First Bank claims that Meritor should be held liable under paragraph 9(a) of the sublease for its failure to correct water infiltration problems which developed in the building before the date of the disaffirmance. This paragraph went far beyond ordinary repair and maintenance. As noted above, it required Meritor to "make all structural and non-structural, foreseen and unforeseen and

---

**3.** During the trial First Bank withdrew its claim against the FDIC for a pro rata share of common area maintenance costs.

**4.** In a December 7, 1994 Order, the court denied First Bank's motion for partial summary judgment and the motion of the FDIC for judgment on the pleadings. To the extent that the opinion accompanying the Order may be read to include capital expenditures as "contractual rent," we disaffirm it. See First Bank National Ass'n v. Federal Deposit Ins. Corp., C.A. No. 94–2197, 1994 WL 697985, 1994 U.S.Dist. LEXIS 17824 (E.D.Pa. Dec. 7, 1994).

ordinary and extraordinary changes and repairs which may be required to keep all parts of the Premises in good repair and condition. . . ."

Water infiltration through the north facade of the PSFS building during severe rainstorms became a recurrent problem years before the disaffirmance. This problem resulted from the original construction of the building in the 1930's. No flashing, or metal panning, was installed between the frames of the windows and the masonry around them. This allowed water to enter the building through rusted areas which eventually developed in the window frames. Moreover, the building was designed without allowances for the expansion and contraction of the brick facade which occurs with temperature changes. While Meritor patched leaks as they occurred by smearing caulk under the windows and on cracks in the brick, these steps failed to prevent the leakage problems from recurring.

First Bank claims that Meritor should have resolved the building's water infiltration problem by installing flashing under the windows and inserting vertical joints in the facade to allow for brick movement. The FDIC argues, however, that such steps exceeded Meritor's obligations under the sublease. The FDIC contends that Meritor "cannot be held liable for omissions in the original design and/or construction" of the building, and that Meritor was not required to "take affirmative steps to improve or rebuild the Premises." The FDIC bases its argument on a provision in paragraph 10 of the sublease stating that Meritor "*may*, at its expense, make additions to and alterations of" the building. (Emphasis added.) The FDIC maintains that the permissive rather than mandatory nature of this provision permits Meritor to decide whether to undertake changes such as those required to remedy the building's water leakage problem.

This court disagrees. Paragraph 9(a) of the sublease required Meritor to "maintain all parts of the Premises in good repair and condition" even if this necessitated "structural" or "extraordinary changes" to the building. A building into which water flows during severe rainstorms is not one which is in "good repair and condition." This problem developed long prior to the date of disaffirmance, and Meritor breached its obligation under the sublease to remedy it. We consider Meritor's obligation to resolve the problem to be part of its contractual responsibilities.

■ This conclusion does not end the analysis, however. The reasonable cost of installing flashing under the windows and inserting vertical joints in the facade to allow for brick movement is $980,000. Structural changes of this nature and magnitude are not simply repair or maintenance items but rather are capital improvements. While Meritor was required under its lease with First Bank to make such improvements, such an obligation does not constitute "contractual rent" under § 1821(e)(4)(B). Accordingly, First Bank's claim to the cost of alterations of the facade and windows will be denied.

■ First Bank also claims that Meritor breached its obligation under paragraph 9(a) of the sublease to keep the building's plumbing, electrical and HVAC systems in "good repair and condition." Although Meritor did do some work on these building systems, that work was incomplete as of the date of disaffirmance. First Bank established that reasonable repairs would cost $355,000 for the HVAC system, $50,000 for the plumbing, and $12,000 for the electrical systems. Since these items were not capital expenditures, First Bank is entitled to receive these amounts as "contractual rent."

■ First Bank further maintains that the term "contractual rent" includes payments of interest. Paragraph 4(b) of the sublease obligated Meritor to pay "interest at the fluctuating rate of 3% above the interest rate per annum announced from time to time by Mellon Bank, N.A." on "amounts which [Meritor] is required to pay pursuant to this [sublease]" with the exception of "amounts payable to maintain the Premises." The sublease thus committed Meritor to pay interest on all unpaid fixed quarterly rent. Interest is designed to compensate the lessor for the delay in receiving money due. The $30,825.69 in interest accrued on the $1,404,666.67 in unpaid fixed quarterly rent between December 11, 1992 and March 31, 1993, the

date of disaffirmance, is properly considered "contractual rent" for which the FDIC is liable.

Paragraph 4(b) of the sublease does not require Meritor to pay interest on building maintenance costs, and therefore such interest would not be "contractual rent." While Meritor was liable for interest on unpaid taxes pursuant to paragraph 4(b), no interest on overdue property taxes accrued before disaffirmance. Section 1821(e)(4)(B) only entitles First Bank to receive amounts "accruing before ... the disaffirmance ... becomes effective." Accordingly, First Bank is not entitled to receive pre-disaffirmance interest on either the unpaid taxes or on building maintenance costs.

This court makes no determination on any of First Bank's claims to interest after the date of disaffirmance. These constitute "[c]laims for interest after the default" to be determined and paid by the FDIC as receiver according to relevant regulatory provisions. *See* 12 C.F.R. § 360.2(a)(7).

■ Finally, First Bank claims it is entitled under the sublease to amounts needed to modify the building to comply with the ADA. Meritor had a contractual obligation to "comply with and cause the Premises to comply with ... all laws ... now or hereafter enacted, made or issued." This provision included the ADA, which was signed by President Bush on July 26, 1990 and became effective July 26, 1992. *See* historical and statutory note to 42 U.S.C.A. § 12111. In 1992, before the FDIC disaffirmed the sublease, Meritor had taken steps to comply with the ADA by removing barriers in seven of the building's bathrooms. According to First Bank, it is entitled to additional amounts for renovation work which will need to be done in the future to ensure full compliance.

Compliance with the ADA may require modification of features such as elevators, bathrooms and doorways. Some of these modifications may be "permanent improvements or betterments made to increase the value of any property or estate" and therefore outside the definition of "contractual rent." However, even if some or all of this obligation is "contractual rent," we must determine whether Meritor's obligation to comply with the ADA "accru[ed] before ... the disaffirmance or repudiation [became] effective" on March 31, 1993. § 1821(e)(4)(B).

While the ADA requires removal of architectural and communication barriers in existing public accommodations such as the PSFS building where such removal is "readily achievable," it does not require this process to be completed by any particular date. 42 U.S.C. § 12182(b)(2)(A)(iv). First Bank has not and cannot contend that the ADA required Meritor to perform work in addition to its bathroom renovations by the date of disaffirmance. Although one might well be able to argue that at some point a delay would constitute non-compliance with the ADA and consequently a violation of the sublease, that point had not been reached by March 31, 1993. This court finds that First Bank has failed to establish that Meritor was in default of its obligation under the sublease to comply with the ADA as of the time of the FDIC's disaffirmance. Accordingly, First Bank is not entitled to funds necessary to ensure future compliance with the ADA.

*JUDGMENT*

AND NOW, this 20th day of April, 1995, in accordance with the accompanying Findings of Fact and Conclusions of Law, it is hereby ORDERED that judgment is entered in favor of plaintiff, First Bank National Association, Trustee, and against defendant, Federal Deposit Insurance Corporation, Receiver for Meritor Savings Bank, in the following amounts:

1. $1,404,666.67 for the "fixed quarterly rent;"

2. $224,119.68 for property taxes;

3. $355,000 for repair of heating, ventilating and air conditioning systems;

4. $50,000 for repair of plumbing;

5. $12,000 for repair of electrical systems; and

6. $30,825.69 for interest accrued on overdue rent prior to disaffirmance of the sublease.

It is further ORDERED that judgment is entered in favor of defendant, the Federal

Deposit Insurance Corporation, Receiver for Meritor Savings Bank, and against plaintiff, First Bank National Association, Trustee, on plaintiff's claims to:

1. Amounts necessary to alter the building's north facade and windows to prevent water leakage;

2. Pre-disaffirmance interest on delinquent tax payments and building maintenance costs; and

3. Amounts necessary to achieve compliance with the Americans with Disabilities Act.