

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-22-1996

# First Bank Natl v. FDIC

Precedential or Non-Precedential:

Docket 95-1519

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"First Bank Natl v. FDIC" (1996). *1996 Decisions.* Paper 222.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/222

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-1519


FIRST BANK NATIONAL ASSOCIATION, as Trustee;
ALJAF ASSOCIATES LIMITED PARTNERSHIP;


v.


FEDERAL DEPOSIT INSURANCE CORPORATION,
as Receiver for Meritor Savings Bank;


        First Bank National Association
        as Trustee ("First Bank"),

                        Appellant


On Appeal from the United States District Court
   for the Eastern District of Pennsylvania
      (D.C. Civil Action No. 94-2197)


Argued February 1, 1996

BEFORE: GREENBERG, NYGAARD, and LAY,* Circuit Judges

(Filed: March 22, 1996)

                    Arthur E. Newbold (argued)
                    Joseph Patrick Archie
                    Dechert, Price & Rhoads
                    4000 Bell Atlantic Tower
                    1717 Arch Street
                    Philadelphia, PA 19103-2793

                    James O. Huber
                    David Lucey
                    Foley & Lardner
                    777 East Wisconsin Ave.
                    Milwaukee, WI 53202

* Honorable Donald P. Lay, Senior Judge of the United States
Court of Appeals for the Eighth Circuit, sitting by
designation.

                                   Attorneys for Appellant

                                   Miles H. Shore
                                   Saul, Ewing, Remick & Saul
                                   3800 Centre Square West
                                   Philadelphia, PA 19102

                                   Ann S. DuRoss
                                   Richard J. Osterman, Jr.
                                   Jerome A. Madden (argued)
                                   Federal Deposit Insurance
                     Corporation
                                   550 17th St., N.W.
                                   Washington, D.C. 20429

                                   Attorneys for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

This appeal requires us to decide a narrow issue: under what circumstances, if any, is the FDIC required to pay the cost of lease-mandated structural repairs and modifications to a building when it acts as a receiver for a failed lessee-thrift and disaffirms its lease under FIRREA? To decide this issue, we must construe 12 U.S.C. § 1821(e)(4), the provision of FIRREA that sets forth the FDIC's obligations when it disaffirms leases. Because we believe that the FDIC's liability for "unpaid rent" under FIRREA includes the costs of the structural repairs mandated by the lease, if any, we will reverse the district court's order rejecting the claim for these repairs. We also

will reverse the district court's order rejecting the lessor's claim for the costs of making modifications to the building to comply with the ADA (Americans with Disabilities Act), because the district court incorrectly applied the "readily achievable" standard to determine whether the liabilities had accrued. We will remand the case to the district court to determine whether the obligation of repairing the building and complying with the ADA had matured by the date the thrift went into receivership.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff, First Bank National Association, Trustee, ("First Bank"), brought this action for breach of contract against the defendant, the Federal Deposit Insurance Corporation ("FDIC") pursuant to the Federal Deposit Insurance Act, 12 U.S.C. § 1811 et seq., as amended by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). First Bank alleged that the FDIC, as receiver for Meritor Savings Bank ("Meritor"), formerly known as the Philadelphia Savings Fund Society, was liable for sums due under a sublease of the historic PSFS building Meritor occupied at 12 South 12th Street, Philadelphia, Pennsylvania.[0]

Meritor, the owner of the PSFS building, entered into a complex series of lease and sublease agreements with First Bank and other entities during the 1980s. First Bank Nat'l Ass'n v.

---

[0]The building, designed by George Howe and William Lescaze and constructed in 1933, is considered one of the first examples in the United States of the International Style of architecture. See Vincent Scully, American Architecture and Urbanism 154 (1988).

3

FDIC, 885 F. Supp. 117, 118 (E.D. Pa. 1995). As a result, First Bank became Meritor's landlord under a sublease for the space Meritor occupied in the building, with Meritor apparently retaining only nominal title to the building. App. 63. Meritor's sublease ran until December 31, 2006, but included three options to renew for ten-year terms until December 31, 2036. First Bank, 885 F. Supp. at 119.

Paragraph 4(a) of the sublease between First Bank and Meritor required Meritor initially to "pay to [First Bank] in lawful money of the United States as fixed rent for the Premises" $1,806,000 per quarter. App. 83, 137. While the sublease provided for subsequent changes in the rent, the $1,806,000 figure controlled when the FDIC became the receiver. Paragraph 6(a)(i) committed Meritor to pay "all taxes, assessments, governmental or quasi-governmental levies, fees, water and sewer rents and charges, and all other governmental charges general and special, ordinary and extraordinary, foreseen and unforeseen" imposed during the term of the sublease. App. 87.

Pursuant to paragraph 6(b) of the sublease, Meritor also was obligated to:
> comply with and cause the Premises to comply with (i) all laws, ordinances and regulations, and other governmental rules, orders and determinations now or hereafter enacted, made or issued, whether or not presently contemplated . . .

App. 89.

> The sublease expansively required that Meritor: maintain all parts of the Premises in good repair and condition, except for ordinary

4

wear and tear and except as expressly provided in paragraph 11(b),[0] and . . . take all action and . . . make all structural and non-structural, foreseen and unforeseen and ordinary and extraordinary changes and repairs which may be required to keep all parts of the Premises in good repair and condition, ordinary wear and tear excepted. Lessor shall not be required to maintain, repair or rebuild all or any part of the premises.

App. 92. Overall, it is clear that the sublease put the risks and burdens of maintaining the building on Meritor.

The Secretary of Banking of the Commonwealth of Pennsylvania declared Meritor to be in unsafe and unsound condition on December 11, 1992, and, pursuant to FIRREA, the FDIC was appointed its receiver on the same day. The FDIC disaffirmed the sublease for the PSFS building pursuant to 12 U.S.C. §1821(e)(1), on March 31, 1993, and the disaffirmance was effective that day.[0]

---

[0] The provisions of paragraph 11(b) are not applicable here.

[0] 12 U.S.C. § 1821(e)(1) provides:

(e) Provisions relating to contracts entered into before appointment of conservator or receiver

(1) Authority to repudiate contracts

In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease–

(A) to which such institution is a party;

(B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and

5

Pursuant to 12 U.S.C. § 1821(e)(4)(B), upon the disaffirmance First Bank, as lessor, was entitled to "any unpaid rent, subject to all appropriate offsets and defenses, due as of the date of the appointment. . . ."  In addition, First Bank was "entitled to contractual rent" from the FDIC "accruing before . . . the disaffirmance [of the lease] . . . becomes effective." Following the disaffirmance, First Bank filed an administrative claim with the FDIC, and, after its rejection, filed this timely action on April 7, 1994, as permitted by 12 U.S.C. § 1821(d)(6).

At the trial, First Bank claimed the FDIC was liable under section 1821(e)(4)(B) for:

(1) $1,404,666.67 in unpaid 'fixed quarterly rent' for the period October 1, 1992 through December 11, 1992;

(2) $224,119.68 in property taxes for the period January 1, 1993 through March 31, 1993;

(3) $285,000 for modification of the building to comply with the Americans with Disabilities Act ('ADA');

(4) $980,000 for rehabilitation of the north facade of the PSFS building;

(5) $50,000 for repair of the plumbing;

(6) $12,000 for repair of the electrical systems;

(7) $355,000 for renovation and repair of the heating, ventilating and air conditioning ('HVAC') system; and

(8) prejudgment interest on all of the above amounts.

---

(C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

6

First Bank, 885 F. Supp. at 119-20.  In its opinion and judgment of April 20, 1995, the district court found that the above claims were valid except for the expenses for the modifications of the building to comply with the ADA, the cost of the structural repairs of the north facade of the building, and prejudgment interest other than that due on the rent.  First Bank appeals from the denial of the costs of structural repairs to the north facade of the building and the costs of modifying the building to comply with the ADA.  The district court had jurisdiction under 12 U.S.C. § 1819(b)(2) and 12 U.S.C. § 1821(d)(6), and we have jurisdiction under 28 U.S.C. § 1291.

## II.  DISCUSSION

To decide whether the district court correctly rejected First Bank's claims for the cost of structural repairs and modifications required by the lease, we must construe 12 U.S.C. § 1821(e)(4), the provision of FIRREA that specifies the FDIC's obligations when it disaffirms leases.

> 12 U.S.C. § 1821(e)(4) reads in whole:
> (4) Leases under which the institution is the
> lessee
>
> (A) In general
>
> If the conservator or receiver
> disaffirms or repudiates a lease under
> which the insured depository institution
> was the lessee, the conservator or
> receiver shall not be liable for any
> damages (other than damages determined
> pursuant to subparagraph (B)) for the
> disaffirmance or repudiation of such
> lease.
> (B) Payments of rent

7

Notwithstanding subparagraph (A), the lessor under a lease to which such subparagraph applies shall-

(i) be entitled to the contractual rent accruing before the later of the date-
(I) the notice of disaffirmance or repudiation is mailed;
(II) the disaffirmance or repudiation becomes effective, unless the lessor is in default or breach of the terms of the lease;

(ii) have no claim for damages under any acceleration clause or other penalty provision in the lease; and

(iii) have a claim for any unpaid rent, subject to all appropriate offsets and defenses, due as of the date of the appointment which shall be paid in accordance with this subsection and subsection (i) of this section.[0]

---

[0] This provision, like much of FIRREA, was modeled after the Bankruptcy Code, in this instance, 11 U.S.C. § 502(b)(6), the provision dealing with a trustee's obligations if it terminates a lease.

11 U.S.C. § 502(b) provides in relevant part:

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that-
. . . .
(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds-

8

First Bank argues that 12 U.S.C. § 1821(e)(4) limits claims only to the extent of "any damages . . . for the disaffirmance or repudiation of such lease."  It thus does not read the words "other than damages determined pursuant to subparagraph (B)" as relating to any obligation other than those flowing from the disaffirmance.  Since the damages for the costs to repair the facade and to comply with the ADA did not result from the disaffirmance, First Bank argues that subsection (e)(4) does not limit its claims.  See Pioneer Bank and Trust Co. v. RTC, 793 F. Supp. 828 (N.D. Ill. 1992).

While we acknowledge that First Bank's reading of section 1821(e)(4) is not unreasonable, we nevertheless disagree with it.  Subsection (4)(B)(iii) states that when the receiver disaffirms a lease, the lessor shall "have a claim for any unpaid rent . . . due as of the date of the appointment."  Such unpaid rent is not a claim that stems from the disaffirmance or repudiation of the lease.  Consequently, if subsection (4)(A)

---

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and
(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates[.]

9

excluded only claims arising from the disaffirmance of the lease, subsection (4)(B)(iii) would be superfluous, as the lessor would have a claim for unpaid rent as of the date of the appointment of the receiver without regard for the disaffirmance.

It is a black letter rule of statutory interpretation that, if possible, a court should construe a statute to avoid rendering any element of it superfluous. See United Steelworkers of Am. v. North Star Steel Co., 5 F.3d 39, 42 (3d Cir. 1993), cert. denied, 114 S.Ct. 1060 (1994). Consequently, we construe subsection (4)(B) to govern the receiver's overall liability for damages when it repudiates a lease. Cf. RTC v. Ford Motor Credit Corp., 30 F.3d 1384, 1387 (11th Cir. 1994) (rejecting argument that section 1821(e)(4) serves only to limit the RTC's liability for interests that accrue wholly after the receivership and permits recovery against property in which the lessor has a perfected security interest); In re McSheridan 184 B.R. 91, 100–02 (Bankr. 9th Cir. 1995) (analogous portion of bankruptcy code encompasses all claims for breach of lease; specifically rejecting argument that appellant's claims for prepetition breach of covenants not "termination" damages and therefore not governed by provision). By rejecting First Bank's narrow reading of 12 U.S.C. § 1821(e)(4), we are consistent with the approach of the district court.

The district court, however, construed subsection (e)(4) to limit claims to "contractual rent," under section 1821(e)(4)(B)(i). It reasoned that "contractual rent" excluded claims for capital improvements because "such improvements by

10

their nature generally have a value to the lessor far beyond the value to the lessee." 885 F. Supp. at 120. This construction makes a distinction between obligations that benefit a lessor over the long term and more conventional contractual obligations. See Oldden v. Tonto Realty Corp., 143 F.2d 916, 920 (2d Cir. 1944) (observing that "landlord not in the same position as other general creditors" because "he has been compensated up until the date of the bankruptcy petition [and] he regains his original assets upon bankruptcy").

While as a policy matter the district court's distinction was reasonable, we reject its conclusion that First Bank's recovery is limited to "contractual rent" because we believe that the language of FIRREA simply will not accommodate the court's reading. Section 1821(e)(4)(B) states in relevant part:

> Notwithstanding subparagraph (A), the lessor under a lease to which such subparagraph applies shall–
>
> (i) be entitled to the contractual rent accruing before the later of the date–
>
> (I) the notice of disaffirmance or repudiation is mailed; or
> (II) the disaffirmance or repudiation becomes effective,
> . . . .
> (iii) have a claim for any unpaid rent, subject to all appropriate offsets and defenses, due as of the date of the appointment which shall be paid in accordance with this subsection and subsection (i) of this section.

Id. Thus, section 1821(e)(4)(B) provides that a claimant has the right to "unpaid rent" due at the date of appointment of the

11

receiver, and "contractual rent" accruing before the latter of the date that the notice of disaffirmance or repudiation is mailed or the date it becomes effective.[0]

"Rent," paid or unpaid, clearly encompasses contractual rent. Yet "contractual rent" must include a different category of claims than "rent" generally. If it did not, there would have been no reason for Congress to distinguish between "unpaid" and "contractual" rent in section 1821(e)(4)(B) or, at least, Congress would have required the FDIC to pay "unpaid contractual rent" rather then "unpaid rent" due as of the date of the appointment of the receiver. Furthermore, it was logical for Congress to limit liability under the lease once a receiver was appointed. We therefore construe section 1821(e)(4)(B) to distinguish between claims that accrue by the date of the receivership and claims that accrue between the date of receivership and the disaffirmance of the lease. See In re Vause, 886 F.2d 794, 801 (6th Cir. 1989) (construing Bankruptcy Act to "provide the lessor with his actual damages for past rent, but placing a limit on his damages for speculative future rent payments in long-term leases").

We therefore must decide if "unpaid rent" encompasses claims for obligations other than the quarterly monetary rent imposed on Meritor by December 11, 1992, the date that the FDIC was appointed its receiver. We then must decide whether any

---

[0]This shadows the scheme limiting claims in the Bankruptcy Code in 11 U.S.C. § 502(b)(6). See n.4 supra.

12

claims that accrued between the date of receivership and the date that the FDIC disaffirmed the lease, March 31, 1993, constitute "contractual rent."

Black's Law Dictionary (6th ed. 1990) defines rent as "consideration paid for use or occupation of property." Meritor's obligation to maintain the premises in good repair was an element of the consideration it paid for use of the property. Presumably, in lieu of a higher quarterly rent payment, the sublease obligated it to:

> maintain all parts of the Premises in good repair and condition except for ordinary wear and tear and . . .[to] take all action and . . . make all structural and non-structural, foreseen and unforeseen and ordinary and extraordinary changes and repairs which may be required to keep all parts of the Premises in good repair and condition . . . .

App. 92. Furthermore, the sublease required Meritor to cause the premises to comply with all applicable governmental laws, ordinances, regulations and rules, even if adopted after the execution of the sublease. Consequently, Meritor had an obligation to keep the premises in good condition and repair, and an obligation to ensure that the premises were maintained lawfully, even if satisfaction of these duties required it to make substantial renovations to the property. We find that these obligations constitute "unpaid rent" for the purposes of 12 U.S.C. § 1821(e)(4)(B)'s specification of the receiver's liability.[0]

---

[0]We do not decide whether an obligation under a lease provision ever could be so extreme as not to constitute "unpaid rent" under 12 U.S.C. § 1821(b)(4)(B)(iii). The obligations involved here

We construe "contractual rent" more narrowly than "unpaid rent," however, to effect the purpose of the statute in giving the receiver an opportunity to survey the thrift's situation without being immediately required to decide whether to assume large obligations. Here we find support in bankruptcy jurisprudence. In 1185 Avenue of the Americas Assocs. v. RTC, 22 F.3d 494, 497 (2d Cir. 1994), the court noted that "chapter 3 of the Bankruptcy Code provides a helpful analogy" to the authority to repudiate contracts under FIRREA. We nevertheless note that the purposes of the Bankruptcy Code are not identical to those of FIRREA and that "equitable principles developed in the reorganization context cannot simply be grafted onto the national banking statutes." Corbin v. Federal Reserve Bank, 629 F.2d 233, 236 (2d Cir. 1980), cert. denied, 450 U.S. 970, 101 S.Ct. 1492 (1981).

In this case, however, the analogy is apt; FIRREA and the Bankruptcy Code both seek to balance the legitimate claims of the lessor with those of the debtor and other claimants. The interests of the lessor were explained well in Oldden v. Tonto Realty Corp., 143 F.2d at 920, where the court explained the history of the bankruptcy provision which limited a landlord's claims for future rent:

> But allowance in full of such claims did not seem the appropriate answer, since other general creditors would suffer proportionately, and the claims themselves would often be disproportionate in amount to any actual damage suffered, particularly in

are not so stringent, particularly when compared to the quarterly rent of $1,806,000.

14

> the event of a subsequent rise in rental
> values.  In truth, the landlord is not in the
> same position as other general creditors, and
> there is no very compelling reason why he
> should be treated on a par with them.  For,
> after all, he has been compensated up until
> the date of the bankruptcy petition, he
> regains his original assets upon bankruptcy,
> and the unexpired term in no way really
> benefits the assets of the bankrupt's estate.

Id. at 919-20 (footnote omitted).  We find reliance on Oldden particularly appropriate as the legislative history of the present Bankruptcy Code shows that Congress approved that case. See H.R. Rep. No. 595, 95th Cong., 1st Sess. 353-54 (1977), Pub. L. No. 598, 1978 U.S.C.C.A.N. (92 Stat.) 6309-10.

In construing 11 U.S.C. § 502(b), the section of the Bankruptcy Code which limits lessor's post-bankruptcy claims, the bankruptcy courts generally have defined rent to be an obligation which is at least "fixed, regular, periodic."  In re Conston Corp., 130 B.R. 449, 455 (Bankr. E.D. Pa. 1991) (holding that claims constitute "rent" only if "the lease expressly so provides and the charges in question are properly classifiable as rent because they are regular, fixed, periodic charges . . ."); In re Gantos, Inc., 181 B.R. 903, 907 (Bankr. W.D. Mich. 1995) (rejecting claim of construction allowance as "rent" because cases hold that payment must be "regular, fixed and periodically payable in the same manner as pure rent"); In re McSheridan, 184 B.R. at 100 ("[C]harge must be properly classifiable as rent because it is a fixed, regular, or periodic charge."); In re Farley, Inc., 146 B.R. 739, 746 (Bankr. N.D. Ill. 1992) ("[Rent] includes any payments that relate directly to or increase the

15

value or worth of the property, and are fixed, regular payments.").

We find this formulation a useful and appropriate requirement to give meaning to Congress's restriction of a lessor's recovery for post-receivership claims to "contractual rent." We conclude, therefore, that "contractual rent" refers only to those sums that are fixed, regular, periodic charges.[0]

In this case, the costs of structural repairs to the facade were not fixed, regular, and periodic. Consequently, the FDIC is not subject to any liability for the cost of repairs that accrued after the institution of the receivership because those costs were not contractual rent. The district court, however, found that "Meritor was required under its lease with First Bank

---

[0] We note that the Bankruptcy Appellate Panel of the Ninth Circuit faced a problem of construing the analogous Bankruptcy Code provision, "rent reserved by such lease," in a similar fact situation of a long-term lease that placed the costs of maintaining the building on the lessee/debtor in In re McSheridan, 184 B.R. 91. In that situation the court held that the following three-part test must be met for a claim to constitute "rent reserved";

> (1) The charge must: (a) be designated as 'rent' or 'additional rent' in the lease; or (b) be provided as the tenant's/lessee's obligation in the lease;

> (2) The charge must be related to the value of the property or the lease thereon; and

> (3) The charge must be properly classifiable as rent because it is a fixed, regular or periodic charge.

We reserve the question as to whether for a charge to be "contractual rent" it must meet requirements other than being "fixed, regular, periodic" because we have no need to consider that point in this case.

16

to [install flashing under the windows and insert vertical joints in the facade to allow for brick movement]" at a cost of $980,000.  885 F. Supp. at 121.  This finding seemingly would make the FDIC liable for the structural repairs to the north facade under its obligation for unpaid rent.

The district court, however, made this finding in determining the contractual rent due to First Bank rather than determining the unpaid rent due.  As a result, it made its calculations as of the date the FDIC disaffirmed the lease, March 31, 1993, rather than the date Meritor went into receivership, December 11, 1992.  Consequently, we must remand for the district court to find what amount, if any, of "unpaid rent" obligations had accrued by the date of the receivership, December 11, 1992.

In addition, we note that the FDIC argues that renovations less extensive than the full $980,000 reconstruction of the facade would have satisfied Meritor's obligations under the sublease.  Since the district court's finding that the full reconstruction was required by the sublease was made in the context of denying the claim altogether, the court should consider whether lesser expenditures would have fulfilled Meritor's obligations.  We will require this reconsideration because the court did not address this possibility in its opinion.

First Bank also argues that the district court erred when it rejected First Bank's claim for compensation to make modifications of the building's bathrooms and elevators to comply

17

with the Americans with Disabilities Act pursuant to paragraph

6(b) of the sublease, which required Meritor to:
>comply with and cause the Premises to comply with (i) all laws, ordinances and regulations, and other governmental rules, orders and determinations now or hereafter enacted, made or issued, whether or not presently contemplated.

App. 89.

This obligation, like the obligation to make structural repairs to the north facade, is clearly part of the consideration that First Bank received for the lease and consequently qualifies as rent for the purposes of 12 U.S.C. § 1821(e)(4)(B)(iii). But since this obligation is not "regular, fixed and periodic," it, too, does not qualify as "contractual rent" under subsection (e)(4)(B)(i). Therefore, for First Bank to recover for the costs of the modifications, Meritor's obligation to make the modifications must have accrued by December 11, 1992, the date the receivership was instituted.

>The section of the ADA implicated here provides that: No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). Subsection (b)(2)(A) of section 12182 describes actions and inactions that constitute discrimination under the statute and it states:
>(2) Specific Prohibitions
>
>(A) Discrimination

For purposes of subsection (a) of this section, discrimination includes-

. . .

(iv) a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities . . . where such removal is readily achievable.[0]

---

[0] "Readily achievable" is a term of art. It is defined by 42 U.S.C. § 12181(9) which states:

The term 'readily achievable' means easily accomplishable and able to be carried out without much difficulty or expense. In determining whether an action is readily achievable, factors to be considered include-

(A) the nature and cost of the action needed under this chapter;

(B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility;

(C) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type and location of its facilities; and

(D) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.

The district court found that:

> While the ADA requires removal of
> architectural and communication barriers in
> existing public accommodations such as the
> PSFS building where such removal is 'readily
> achievable,' it does not require this process
> to be completed by any particular date. . . .
> Although one might well be able to argue that
> at some point a delay would constitute non-
> compliance with the ADA and consequently a
> violation of the sublease, that point had not
> been reached by March 31, 1993.

885 F. Supp. at 122. The district court thus seemed to find that in order to constitute non-compliance under the ADA, a particular unmade modification: (1) must be "readily achievable" and (2) that an unspecified period, essentially a grace period, must have elapsed after the ADA's effective date even though the modifications were "readily achievable" earlier.

To the extent that the court's holding suggests that a grace period exists, we disagree because we find no provision for a grace period in the ADA. We want to make clear, however, that in rejecting the "grace period" construction, we are not implying that the passage of time is irrelevant in determining liability under the ADA. We are simply rejecting the district court's suggestion that liability depends on a temporal element that is independent of the "readily achievable" standard.

In considering what is "readily achievable" with respect to removal of architectural barriers, we first observe that the "readily achievable" standard necessarily includes a temporal element. The ADA defines "readily achievable" as "easily accomplishable and able to be carried out without much

20

difficulty or expense."  Yet what is easy to accomplish in one

year may not be easily accomplishable in one day so a

determination of what is "readily achievable" depends upon the

passage of time.  Furthermore, the ADA does not indicate

expressly whether the temporal element in "readily achievable"

should be measured from the date of the ADA's enactment, July 26,

1990, or the general effective date for the public accommodations

title, January 26, 1992.  We observe, however, that cognizant of

the burdens of the ADA's requirements, Congress granted small

businesses more time than larger organizations before they could

be liable for violations of the ADA.[0]  Thus, it might be

---

[0]Section 310 of Title III of the Americans with Disabilities Act, Pub. L. 101-336, 104 Stat. 353, provided that:

> (a) General rule - Except as provided in subsections (b) and (c), this title [enacting this subchapter] shall become effective 18 months after the date of the enactment of this Act [July 26, 1990].

> (b) Civil actions. - Except for any civil action brought for a violation of section 303 [section 12183 of this title, governing requirements for new construction], no civil action shall be brought for any act or omission described in section 302 [section 12182 of this title] which occurs-

>> (1) during the first 6 months after the effective date, against businesses that employ 25 or fewer employees and have gross receipts of $1,000,000 or less; and

>> (2) during the first year after the effective date, against businesses that employ 10 or fewer employees and have gross receipts of $500,000.

reasonable to conclude that the temporal element in a determination of whether the removal of a barrier is "readily achievable" should be measured from the ADA's enactment.

Indeed, it could be held as a matter of statutory construction that the ADA required that "readily achievable" modifications to existing facilities be made by its effective date so that the period between the enactment and the effective date fixed the temporal element of the "readily achievable" provision. See Pinnock v. International House of Pancakes Franchisee, 844 F. Supp. 574, 584 (S.D. Cal. 1993) ("ADA provided an 18 month notice period in which businesses could comply with the Act's requirements . . . . [and] [s]mall businesses were given an even lengthier notice period."). See also Karen E. Field, Note, The Americans With Disabilities Act "Readily Achievable" Requirement For Barrier Removal: A Proposal For The Allocation of Responsibility Between Landlord And Tenant, 15 Cardozo L. Rev. 569, 570 (1993). Of course, the district court in effect rejected this construction of the ADA by holding that, at least in this case, the ADA did not require "readily achievable" modifications to be made by March 31, 1993. Yet, if the determination of whether a modification is "readily achievable" includes a temporal element measured from the date of the ADA's enactment, and concluding on its effective date, then the public accommodations section of the ADA was in a practical sense effective upon its enactment, rather than its stated effective date, because it required entities to comply with its

22

requirements no later than at the expiration of the 18-month period between its enactment and its effective date.

At this time we will not decide the point from which compliance with the "readily achievable" standard should be measured. As we have indicated we have concluded that, regardless of that point, the district court did not apply the proper criteria to determine whether Meritor was in compliance with the ADA at the time of the initiation of its receivership. Thus, we will remand the case to it for further proceedings.

On the remand, the court first should determine whether the ADA should be construed to require that modifications, if "readily achievable," must be made by the effective date of the public accommodations title of the ADA to the facility involved.[0] If it so concludes then First Bank will be able to recover for the reasonable costs of the modifications to existing facilities in this case if they were "readily achievable" because the effective date of the ADA was prior to December 11, 1992. If the court concludes as a matter of statutory construction that the ADA did not require otherwise "readily achievable" modifications to be made by its effective date, it should determine: (1) whether the temporal elements of "readily achievable" should be

---

[0] In its brief, First Bank indicates that even "assuming that the PSFS Building was a 'commercial facility' and not a place of public accommodation, the latest effective date for the ADA would be July 26, 1992, about nine months before the FDIC's disaffirmance of the Lease." Br. at 22 n.3. The FDIC seems to argue that if the building is a commercial facility, the ADA may not apply to it as it is not newly constructed. Br. at 23 n.10. These points may be raised on remand.

23

measured from the ADA's enactment or its effective date, and; (2) whether the modifications in this case were "readily achievable" as a matter of fact by December 11, 1992. To the extent, if any, that the modifications should have been made by that date, First Bank will be able to recover their reasonable cost.

### III. CONCLUSION

In view of our conclusions, we will reverse the April 20, 1995 judgment of the district court both as to the denial of First Bank's claim for the cost of structural repairs to the north facade of the building and as to the district court's denial of First Bank's claim for ADA-mandated renovations. We will remand the matter to the district court for further proceedings consistent with this opinion with respect to the claim for structural repairs to the north facade and the ADA-mandated renovations.